# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3702 | **DATE** | 3/31/2004 |
| **CASE TITLE** | Robert Jarmon vs. JoAnn Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment [#13] is **granted**; Defendant's Cross-Motion for Summary Judgment [#23] is **denied**. The case is hereby remanded to the Commissioner for further proceedings consistent with this Order. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | date docketed | **28** |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | **15** docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | 3/31/2004 date mailed notice | |
| FT/_secy_ | courtroom deputy's initials | 2004 MAR 31 AM 11:29 | **FT** mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

ROBERT JARMON,                    )
                                  )
                Plaintiff,        )        No. 02 C 3702 R - 1 2004
                                  )
                                  )
        vs.                       )        Magistrate Judge
                                  )        Arlander Keys
JO ANN B. BARNHART,               )
Commissioner of Social Security,  )
                                  )
                Defendant.        )

## MEMORANDUM OPINION AND ORDER

Robert Jarmon applied for Supplemental Security Income (SSI)
and Disability Insurance Benefits (DIB) on June 25, 1999,
claiming that he suffers from both physical and mental
impairments that prevent him from working.  The Social Security
Administration ("SSA") denied Mr. Jarmon's application, and,
after exhausting his appeal rights before the SSA, Mr. Jarmon
filed an action in the United States District Court seeking
review of the agency's decision.  The case is before the Court on
the parties' cross-motions for summary judgment.

### Facts and Procedural History

Robert Jarmon, now forty-one years old, is an Army veteran
with the equivalent of a high school education and two
associate's degrees, one for cosmetology and the other for
network security.  Record at 17, 450.  In the past, Mr. Jarmon

28

has worked as a beautician, a cook, and a painter. Record at 57.
He last worked as a park maintenance worker; he was on the job
for approximately two months when he had to quit because of his
impairments. Record at 452.

Mr. Jarmon applied for SSI and DIB on June 25, 1999,
claiming on his application that, as of March 1, 1999, he was
unable to work because of varicose veins in his lower
extremities, blood clots, substance abuse and mental problems.
Record at 56-60. The SSA denied his claim initially and on
reconsideration. Mr. Jarmon requested a hearing before an
administrative law judge, and the case was assigned to Judge
Alfred Burton, who held a hearing on August 14, 2000.

At the hearing, the ALJ heard from Mr. Jarmon, who testified
first, and from Dr. Richard Zaloudek, a medical expert. Mr.
Jarmon, who was represented by counsel, testified that he was
currently living in a shelter, that he was single, had never been
married and had no children. Record at 448. He testified that
he received a GED in 1982, and that he had associates degrees in
both cosmetology and security. *Id.* at 449. Mr. Jarmon testified
that he served in the United States Army from January 7, 1980 to
January 7, 1983, when he was honorably discharged. *Id.* at 450.
He testified that he had been receiving disability payments in
connection with his service in the Army since 1983; as of

December 1999, he received $794 per month for service-connected disability. *Id.* at 451-52. He also testified that he was not working, that he last worked in March of 1999, when he developed blood clots in his legs and had to quit his job. *Id.* at 452. He alleges that his disability onset date was March 1, 1999. *Id.* at 460. Mr. Jarmon testified that, prior to his park maintenance job with the North Chicago Park District, he worked as a cook and as a painter. *Id.* at 453-58.

With respect to his impairments, Mr. Jarmon testified that he suffered frostbite to his legs in 1982, and then developed varicose veins in both legs, but more predominantly in his right leg, and ulcers in his right ankle. *Id.* at 460. He testified that, in addition to his leg problems, he also suffers from depression; he testified that he had been receiving treatment for his depression since about March of 1999, and that he was currently taking anti-depressants. *Id.* at 461-62.

With respect to his daily activities, he testified that he doesn't really do much during the day, he just pretty much sits around at the shelter, and spends his time alone; he participates in weekly counseling sessions, he watches television and reads the paper, sometimes he takes a walk or goes to the park. *Id.* at 463, 466-68. He testified that he had abused drugs and alcohol in the past, but that he was not using either at the time of the

hearing; he testified that he last drank in May of 2000. *Id.* at 464-65. In response to questioning from his attorney, Mr. Jarmon testified that he can walk a block or two before he runs out of breath, and, even then, he has to walk slowly because of his ulcers and varicose veins. *Id.* at 468-69. He testified that he uses a cane, on the advice of his doctor. *Id.* at 471. He testified that his depression make it difficult for him to concentrate, sit or read for any significant period of time. *Id.* at 471-72. He testified that he feels kind of confused, he hears noises (babies crying, cats purring and meowing) that aren't really there, sometimes he thinks people are trying to harm him. *Id.* at 474. He testified that he is forgetful, and that he has difficulty sleeping. *Id.* at 475. In response to questions from the medical expert, Mr. Jarmon testified that he had been hospitalized several times for mental problems, and that one time, at Hines, he was told that "the alcohol and drugs was part of me being depressed so they took me to the alcohol and drug unit." *Id.* at 482.

After Mr. Jarmon, Dr. Zaloudek testified. He testified that, in his opinion, Mr. Jarmon has a severe impairment that includes drug and alcohol abuse and dependence, which is in early remission, and that he also has a schizoaffective disorder, which Dr. Zaloudek characterized as follows:

4

a depression that can show up with a person being a
loner or a social isolated.  And can have symptoms of
hallucinations or paranoia.  It falls between the
condition of schizophrenia and major depression.
Sometimes the person has problems collecting their
thoughts and difficulties with concentration.  And
they're put on usually a combination of medications
such as anti-depressants and anti-psychotic
medications.

Record at 483. Dr. Zaloudek testified that Mr. Jarmon's mental

impairments did not meet or equal a listed impairment.  *Id.*  He

testified that, functionally, Mr. Jarmon's depression would make

him agitated and cause him to suffer deficits of concentration;

he testified that Mr. Jarmon would have "marked difficulties"

completing a normal workday or a normal workweek because "he

wouldn't be able to maintain contration without the interference

of psychological problems."  *Id.* at 484.  Dr. Zaloudek testified

that, in his view, Mr. Jarmon would have "moderate restrictions

of daily activities and social functioning, but frequent

deficiencies of concentration, persistence of pace."  *Id.* at 485.

He testified that Mr. Jarmon experienced sleep difficulties,

psychomotor agitation and difficulties with concentration, which

"would be enough to satisfy the criteria of a major affective

disorder."  *Id.*

In addition to the testimony of Mr. Jarmon and Dr. Zaloudek,

the ALJ considered Mr. Jarmon's extensive record of medical

treatments and assessments.  According to that record, Mr. Jarmon

5

was admitted to the North Chicago VA Hospital (NCVA) on October 5, 1998 for alcohol and substance abuse. He was referred to NCVA by his probation officer, who was monitoring Mr. Jarmon in the wake of a domestic violence incident, after he showed up to an appointment under the influence of alcohol. Record at 246. The records from NCVA show that, at the time he was admitted, Mr. Jarmon reported that he had started drinking at age 14, that he drank 1 to 2 pints of gin per day, plus a six-pack of beer; he stated that he had had his last drink about two weeks prior to his admission. Record at 252. He further reported that he had started using cocaine in 1994, and that his habit was up to about $300 per day; he reported that he had last used cocaine three weeks before his admission. *Id.* As part of the admission process, NCVA also conducted a psychiatric evaluation; the evaluator concluded that Mr. Jarmon had no major depressive or psychotic symptoms, and no suicidal or homicidal ideations. Record at 251. The record shows that, by October 22, 1998, the NCVA staff had diagnosed Mr. Jarmon with alcohol and cocaine dependence, in early partial remission in a controlled environment, and major depressive disorder, recurrent, with psychotic features. Record at 235. According to the notes from that date, Mr. Jarmon's "major diagnosis is Borderline Personality Disorder with sequelae of substance abuse and

depression. He reports history of chaotic, violent relationships and self harming behavior." *Id.* The notes conclude that, given this diagnosis, "Mr. Jarmon's prognosis for recovery is very poor." *Id.* While at NCVA, Mr. Jarmon started taking anti-depressants, and, over time, some of the negative symptoms he had experienced lessened or stopped altogether; the record shows that Mr. Jarmon started sleeping better, he stopped engaging in self harming behaviors, stopped biting his nails, stopped pulling out his lashes and hair; he became calmer and less anxious. *See, e.g.,* Record at 194, 196, 213.

The record shows that, in the middle of his stay at NCVA, Mr. Jarmon was admitted to the West Side VA Hospital for treatment of his "veinous thrombosis" and blood clots. Record at 102-125. For the latter, Mr. Jarmon underwent two venograms with urikinase treatment, but when the clots persisted, the doctors prescribed a long-term course of anticoagulants (coumadin) and discharged him on March 31, 1999; he was instructed to report directly to the halfway house at NCVA. *Id.* at 115.

The record shows that, upon returning to NCVA, Mr. Jarmon reported feeling more anxious and his sleep problems appeared to re-emerge. *See, e.g.,* record at 190, 191. The notes from April 12, 1999 show that Mr. Jarmon reported experiencing "psychological or emotional problems on 30 days during the past

"30 days"; that he experienced "serious depression, serious anxiety or tension, trouble understanding, concentrating or remembering and trouble controlling violent behavior"; and that he had "serious thoughts of suicide in the past 30 days." Record at 182. According to the evaluator, Mr. Jarmon's representations on April 12 were "not significantly distorted by misrepresentation." *Id.* Just a week later, however, the attending psychiatrist's notes show that Mr. Jarmon was "stable," with no symptoms of depression or anxiety, and that he denied having any suicidal or homicidal ideations. Record at 181. A note from May 13, 1999 confirms that Mr. Jarmon was "doing well, his sleeping pattern has stabilized; his depressive [symptoms] lifted." Record at 170. On June 7, 1999, NCVA discharged Mr. Jarmon from its program, when he failed to return to the facility after being granted a weekend pass. Record at 164.

The record shows that Mr. Jarmon returned to the NCVA on June 17, 1999, stayed for a few days, and was then discharged on June 22, 1999 when he, once again, failed to return to the facility. Record at 162. On June 30, 1999, Mr. Jarmon turned up at the West Side VA Hospital, seeking a psychiatric clearance so that he could obtain a room in the YMCA. He was evaluated in the psychiatry assessment clinic, he reported that he had been sober for the past nine months, he denied any drug or alcohol use and

any affective or psychotic symptoms, and, in the end, he was deemed "stable to obtain housing at the YMCA." Record at 121-22.

It is unclear whether Mr. Jarmon ever actually received housing at the YMCA. But the record shows that, on July 21, 1999, he was admitted to Skokie Meadows Nursing Center, a facility that provided short-term and long-term care for individuals with psychiatric disorders, substance abuse problems, or both. Record at 263, 82. According to a "report of contact" form in the record, Mr. Jarmon was admitted to Skokie Meadows for short-term care "for sobriety"; the administrator who spoke to the SSA representative reported that Mr. Jarmon had "no real psychiatric diagnosis," and that he "has some depression, probably secondary to his substance abuse." Record at 82.

The record shows that Mr. Jarmon returned to the NCVA on April 17, 2000. According to the notes in the file, Mr. Jarmon was incarcerated for three months, from about December of 1999 to March of 2000, after he violated an order of protection issued for his long-time, on-and-off girlfriend. Record at 378-80. He went to NCVA shortly after his release to see whether he should re-start coumadin to help with his blood clots, and was told that that was not necessary. *Id.* at 380. He returned to West Side VA Hospital the next month, after relapsing into substance abuse. *Id.* at 379. In addition to the relapse, in May of 2000 Mr.

Jarmon also suffered two episodes where he was temporarily blinded and felt numb on his left side. Record at 377. He was admitted to West Side VA Hospital on May 17, 2000, and, after a psychiatry assessment, was re-started on anti-depressants. Record at 374, 378. Mr. Jarmon was discharged from the hospital on May 22, 2000. *Id.* at 364.

On June 8, 2000, Mr. Jarmon returned to NCVA for substance abuse treatment. Record at 421. He was admitted that day, and diagnosed with alcohol and cocaine dependence, dysthymic disorder, borderline personality disorder, deep venous thrombosis, and varicosities of the lower extremeties. *Id.* Progress notes from June 23, 2000 indicate that Mr. Jarmon resumed taking antidepressants because of his continued sleep disturbances and anxiety symptoms; he denied having any suicidal or homicidal ideations. *Id.* at 405. Notes from July 13, 2000 indicate that, by that date, Mr. Jarmon had completed the substance abuse treatment program and was stable for discharge; he had no symptoms of major depression, mania or psychosis and was experiencing no suicidal or homicidal ideations. Record at 389. The notes show that the plan upon discharge was for Mr. Jarmon to receive follow up care at the West Side VA Hospital. *Id.*

In addition to the treatment records, the documentary

10

evidence before the ALJ also included reports from an internist and a psychiatrist who evaluated Mr. Jarmon at the behest of the SSA in August 1999. The internist, Dr. Peter Biale, diagnosed Mr. Jarmon with "bilateral mild varicosities in the right leg" and "ulcers in the medial aspect of the leg," as well as recurrent blood clots, hypertension and depression. Record at 266. The psychiatrist, Dr. Michael Wagner, noted that Mr. Jarmon "was given a diagnosis of schizoaffective disorder, depressed type and dementia not otherwise specified," and that he "also has a history of alcohol and polysubstance abuse." Record at 269. Based upon the mental status examination he performed on Mr. Jarmon, Dr. Wagner concluded that "it might be reasonably expected that this claimant might have difficulty with effectively managing simple funds in their best interest." *Id.*

Additionally, on January 28, 2000, Mr. Jarmon underwent a round of consultative examinations and evaluations for the SSA. First, he was examined by Dr. Claude Hamilton, who "spent approximately 50 minutes with the claimant in evaluating medical records, forms, and in formulating and dictating this report." Record at 296. Dr. Hamilton noted Mr. Jarmon's history of drug and alcohol abuse, psychiatric illness, blood clots and hypertension. Record at 300. He determined that Mr. Jarmon continued to use drugs, but was otherwise stable; he made no

findings concerning Mr. Jarmon's psychiatric illness, leaving
that assessment to the consulting psychiatrist. *Id.* at 300. Dr.
Maria Mynatt performed the consultative psychiatric evaluation;
she reviewed the earlier reports prepared by Dr. Wagner and Dr.
Biale, and she spent about 40 minutes with Mr. Jarmon. Record at
303. According to Dr. Mynatt's report, Mr. Jarmon was feeling
depressed at the time of the evaluation; he reported that his
sleep was poor, his appetite was low, he was having suicidal
thoughts and occasional homicidal thoughts, as well as auditory
hallucinations; he stated that his memory was terrible, that he
had difficulty concentrating, making decisions and staying on
task. *Id.* at 303-04. In the summary section of her report, Dr.
Mynatt focused on both Mr. Jarmon's substance abuse problems, and
his depression and concluded that his "[p]rognosis remains
guarded." *Id.* at 306. Under the diagnosis section, she noted
polysubstance dependence, schizoaffective disorder (currently
depressed), thrombophlebitis, recurrent blood clots, ulcers, and
hypertension. *Id.* She noted that he had a "[c]urrent GAF of
about 45," *id.*, meaning that she put him at a 45 on the Global
Assessment of Functioning Scale, a "hypothetical continuum of
mental health-illness." Diagnostic and Statistical Manual of
Mental Disorders, Fourth ed. (DSM-IV), p. 32. A score of 45
indicates "**[s]erious symptoms** (e.g., suicidal ideation, severe

obsessional rituals, frequent shoplifint) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." *Id.* (emphasis in original).

The record also contains an April 7, 2000 note from Dr. Zaloudek, the same medical expert who testified before the ALJ, stating that he "agree[s] with the PRTF and MRFC as signed by Dr. Hermsmeyer on 9-9-99 and affirmed by Dr. Tomassetti on 2-9-00." Record at 328. According to those documents, Mr. Jarmon suffered from both schizophrenic, paranoid or other psychotic disorder, and substance addiction disorders. Record at 307. Drs. Hermsmeyer and Tomassetti found that Mr. Jarmon's disorders functionally limited his activities of daily living, his social functioning, and his concentration, persistence or pace. *Id.* at 314. Specifically, Drs. Hermsmeyer and Tomassetti found that Mr. Jarmon was moderately limited in his ability to understand and remember detailed instructions, and his ability to carry out detailed instructions, but that he had the mental capacity to perform simple tasks. *Id.* at 315-17. Although not specifically mentioned by Dr. Zaloudek, the record also contains a residual functional capacity assessment prepared on February 22, 2000 by Dr. F. Paul LaFata, who concluded that Mr. Jarmon could lift 20 pounds occasionally and 10 pounds frequently, that he could stand, walk and sit about 6 hours in an 8-hour workday, and that

13

his ability to push and pull was unlimited. Record at 320. Dr. LaFata's RFC also indicates that Mr. Jarmon could occasionally climb, and frequently balance, stoop, kneel, crouch and crawl. *Id.* at 321.

The ALJ issued his decision on September 29, 2000, finding that Mr. Jarmon retained the residual functional capacity to perform the full range of light work and was, therefore, not disabled within the meaning of the Social Security Act. Record at 22. The ALJ specifically noted that, if he had considered Mr. Jarmon's substance abuse disorder, he would have found Mr. Jarmon to be disabled because his addictions prevented him from performing even a simple, unskilled job on a sustained basis. *Id.* But, the ALJ concluded, because Mr. Jarmon's addictions were contributing factors material to the finding of disability, Public Law 104-121 precluded him from finding Mr. Jarmon to be disabled. *Id.* at 21-22. On this last point, the ALJ found, after "combing through the medical evidence," that Mr. Jarmon's addictions were material to the residual functional capacity determination; specifically, the ALJ determined that, "[a]lthough the claimant has been diagnosed with a schizoaffective disorder, the evidence shows that the claimant's primary problem appears to be with substance abuse." *Id.* at 19. Additionally, in assessing Mr. Jarmon's residual functional capacity, the ALJ chose not to

14

credit Dr. Zaloudek's testimony from the hearing that Mr. Jarmon was incapable of performing even a simple, unskilled job on a sustained basis. *Id.*

The ALJ's decision became the final agency decision when the Appeals Council denied review on April 3, 2002. *See* 20 C.F.R. §416.1481. Mr. Jarmon then filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on July 30, 2003. Thereafter, both parties moved for summary judgment.

## Discussion

A district court must affirm the ALJ's finding if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d. 936, 940 (7th Cir. 2002). Substantial evidence is more than a mere scintilla of evidence and consists of "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). The ALJ need not weigh every piece of evidence; however, when the SSA Commissioner's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. Generally, a court that is reviewing the

Commissioner's decision may not re-weigh the evidence, re-try the case, or substitute its own judgment for that of the Commissioner. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). Review is limited to examining whether the ALJ applied the proper legal standard and whether there is substantial evidence to support the ALJ's findings. 42 U.S.C. § 405(g); *see also Scivally v. Sullivan*, 966 F. 2d 1070, 1075 (7th Cir. 1992).

The Social Security regulations provide a five-step analysis to determine whether a claimant is disabled: (1) the ALJ first asks whether the claimant is currently employed; (2) if the claimant is unemployed, then the ALJ asks whether the claimant's impairment is severe; (3) if the impairment is severe, the ALJ determines whether the impairment meets or equals one of the listed impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if the impairment meets one on the listing, then the claimant is disabled; if it does not, then the ALJ must determine whether the claimant is able to perform his past relevant work; (5) if the claimant is unable to perform his past relevant work, the ALJ must determine whether there is any work in the national economy that the claimant can perform. *See* C.F.R. § 404.1520(a)-(f); Maggard v. Apfel, 167 F.3d 376, 378 (7th Cir. 1999); *Goodson v. Barnhart*, 217 F.Supp.2d 892, 900 (N.D. Ill. 2002). When applying this sequential process, if the ALJ

determines at any time that the claimant is not disabled, the analysis ends. *Goodson,* 217 F. Supp.2d. at 900. The claimant has the burden of establishing a disability at steps one through four; however, if the analysis reaches step five, then the burden shifts to the SSA, to show that there are other jobs in the national economy that the claimant is capable of performing.

Additionally, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2002). Therefore, not only must the record contain evidence to support the ALJ's finding, but the ALJ must also rationally articulate the basis for his findings. *Steele*, 290 F.3d at 941. Without this connection, the district court must remand the ALJ's decision. *Id.*

In this case, the ALJ applied the five-step analysis outlined above, and found initially, that Mr. Jarmon was not engaged in substantial gainful work, as he had been unemployed since March of 1999. Record at 19. At step two, the ALJ found that Mr. Jarmon suffered from a "severe substance abuse disorder and also suffers a severe physical impairment." *Id.* At step three, the ALJ determined that Mr. Jarmon's physical and mental impairments, whether combined or alone, did not meet or equal any

listed impairments. *Id.* At step four, the ALJ found that Mr. Jarmon was unable to perform his past relevant work. *Id.* at 21. He determined, however, that Mr. Jarmon "retains the residual functional capacity for light work activities, with standing and walking of 6 hour [sic] in a workday and lifting 20 pounds occasionally and 10 pounds frequently." Record at 20. At step five, the ALJ found that, given his physical and mental limitations, his age and his education, Mr. Jarmon had the residual function capacity to perform the full range of light work. *Id.* at 22.

After analyzing Mr. Jarmon's case under the five step analysis required by the regulations, the ALJ noted that, if Mr. Jarmon's substance abuse was considered, then he would have found Mr. Jarmon to be disabled. The ALJ concluded, however, that under 42 U.S.C. 423 (d)(2)(C), which prohibits a finding of disability when a claimant's substance abuse is a material contributing factor, Mr. Jarmon was not disabled.

By way of background, in 1996, Congress enacted Public Law 104-121, the "Contract With America Advancement Act of 1996." Section 105, entitled "Denial of Disability Benefits to Drug Addicts and Alcoholics," provided that claimants "shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be

18

· a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423 (d)(2)(C). SSA regulations provide that the Commissioner must consider "the combined effect of all of [the claimant's] impairments" when making a disability determination. 20 C.F.R. § 416.923; *see also Goodson v. Barnhart*, 217 F. Supp. 2d 892, 902 (N.D. Ill. 2002). However, when it is not possible to separate the mental impairment documented in the evidence, from the drug or alcohol abuse, then "a finding of 'not material' would be appropriate." *Clark v. Apfel*, 98 F. Supp. 2d 1182, 1185 (D.C. Ore. 2000) (*quoting* Social Security Administration Emergency Teletype of DAA, August 30, 1996, Answer 29).

In Mr. Jarmon's case, the ALJ determined that Mr. Jarmon's "primary problem" was his substance abuse disorder. Record at 19. The ALJ noted that, if he "considered the affects of the claimant's drug and alcohol abuse, [he] would find that [Mr. Jarmon] was unable to perform even a simple, unskilled job on a sustained basis and that jobs did not exist in significant numbers, in the national economy that he could perform." Record at 21. He then applied Public Law 104-121, which prohibits disability benefits when drug or alcohol abuse are a "material contributing factor" to the impairments, and found that Mr. Jarmon was not disabled. Record at 21. Fundamentally, however,

19

the fact that Mr. Jarmon's substance abuse was his "primary problem" should not automatically have caused the ALJ to disregard all of his other problems. *See Goodson*, 217 F. Supp. 2d at 902 (stating that ALJ must look to the combined affect of all of a claimaint's impairments). The Court does not read Public Law 104-121 to say that, if there is a component of mental illness separate and apart from the addiction disorders, the ALJ is required to throw the claimant out on his head. Here, the ALJ did not adequately address Mr. Jarmon's history of psychological problems; he merely dismissed them as being secondary to the addiction disorders, and this is inappropriate, given the evidence in the record suggesting that Mr. Jarmon's psychological impairments might have existed separate and apart from his substance abuse. *See Myers v. Chater*, 1997 WL 116805, *13 (N.D. Ill. 1997) (remanding the case because the ALJ did not provide an explanation for dismissing the claimant's mental impairment claim, which, according to the district court, meant that the ALJ made an impermissible medical determination). Although the ALJ is in the best position to decide the evidence, he must still address the issues before him and adequately explain his reasoning and determination. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (holding that the ALJ is not required to examine every piece of evidence, but must still articulate a

legitimate reason for his decision).  With one exception, the reports documenting Mr. Jarmon's mental impairments treat the borderline personality disorder and the schizoaffective disorder as a separate diagnosis from the substance abuse disorders.  This at least suggests that the non-substance abuse afflictions were, to a variety of health professionals, note-worthy in their own right.

It is true, as the ALJ noted, that Mr. Jarmon was told by his doctors that alcohol and drug use were part of his depression.  Record at 18.  But that is not necessarily the same thing as saying that the addictions were a material contributing factor in his mental impairments.  Without some explanation, the ALJ's conclusion seems dismissive.  And the ALJ's dismissiveness with regard to the psychological evidence is reflected in the way he viewed the record.  For example, the ALJ's decision states that "[s]ignificantly, the *only* mental diagnosis given was rehabilitation for alcohol and cocaine dependence," and he cites one of the medical assessments to support that finding.  Record at 18 (emphasis added).  But the report he cites actually states that Mr. Jarmon's primary diagnosis is Borderline Personality Disorder, and that, due to this problem, Mr. Jarmon' s "prognosis for recovery is very poor."  Record at 235.  Further, although the ALJ concluded that there were no other mental health

concerns, he recognized that Mr. Jarmon was given other mental health diagnoses, including dysthymia and borderline personality disorder, approximately one year later. Record at 18. Also, although the ALJ dismissed Mr. Jarmon's depression by noting the numerous times that Mr. Jarmon was *not* experiencing suicidal or homicidal ideations, the ALJ failed to mention the documentation showing that Mr. Jarmon had, in fact, attempted suicide in the past, including one time when he was stopped by the police, that he had, in fact, engaged in self-mutilating behavior, and that he had, in fact, had thoughts of hurting his girlfriend and her child. The ALJ never questioned whether these manifestations of Mr. Jarmon's very real mental illness would have affected his ability to hold down a job; instead, he noted the substance abuse and ended the matter, without discussing how Mr. Jarmon's other mental impairments might come into play. Because of this hole in the analysis, the Court is unable to meaningfully review the ALJ's ultimate conclusion that Mr. Jarmon was not disabled. The case must, therefore be remanded.

Having said all of this, it is important to note that, at the end of the day, the ALJ may well be right about Mr. Jarmon's mental impairments; his substance abuse may very well turn out to have been a material contributing factor in his schizoaffective disorder and borderline personality disorder diagnoses, and that

22

any finding of disability would have had to have stemmed, in a material way, from the substance abuse. But on the record before it, the Court cannot sustain that conclusion. On remand, the ALJ must do a better job of explaining why he believes a person with Mr. Jarmon's impairments – his physical impairments and his non-substance abuse mental impairments – is capable of performing a significant number of jobs in the national economy. On the record as developed, that conclusion is not self-evident.

### Conclusion

For the reasons set forth above, the Court finds that the ALJ's findings at step five are not supported by substantial evidence, and that the ALJ failed to build an accurate and logical bridge between the record evidence and his conclusions that Mr. Jarmon's addictions were a material contributing factor in his mental impairments, and that Mr. Jarmon was capable of performing other jobs in the national economy. The Court, therefore, grants Mr. Jarmon's Motion for Summary Judgment, and denies the Commissioner's. The Court remands the case to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

Date: March 31, 2004          ENTER:

_Arlander Keys_

ARLANDER KEYS
United States Magistrate Judge

23